UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARTIN BAYNE
                                         **Plaintiff,**

-against-                                                                          1: 04-CV-44

SHAWNDA M. PROVOST, STEPHEN A. MEEHAN
and THE NEW YORK STATE POLICE

                                       **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

**I. INTRODUCTION**

Plaintiff Martin Bayne ("Plaintiff") commenced this action asserting claims under 42 U.S.C. § 1983 and New York common law. See Compl., doc. # 1. Plaintiff contends that he was falsely arrested[1] when Defendant New York State Troopers Shawnda M. Provost and Stephen A. Meehan responded to a 911 call alleging that Plaintiff had threatened suicide, and "took [Plaintiff] from his home and placed him in the custody of an ambulance crew [] which brought him to Saratoga Hospital for a mental health evaluation." Id. ¶ 13. Defendants have moved for summary judgment arguing that the action should be dismissed (1) against the New York State Police and the individual defendants in their official capacities because these claims are barred by the Eleventh Amendment,

---

[1] Plaintiff couches his state law claims in terms of "false imprisonment" but, as discussed more fully in the text, the same standard applies whether the claim is analyzed as a "false arrest" or "false imprisonment" claim, and whether the claim in analyzed under Section 1983 or under New York common law.

1

and (2) against the individual defendants in their individual capacities because any arrest was privileged and, if it was not, that the officers are entitled to qualified immunity. Plaintiff opposes the motion only inasmuch as it is addressed to the claims against the individual officers. The motion was taken on the basis of the submission alone. For the reasons that follow, the motion is granted and the action is dismissed.

## II. BACKGROUND FACTS

On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002). The following facts are either unopposed or construed in the light most favorable to Plaintiff. Inasmuch as the instant motion turns on the facts and circumstances known by the Troopers at the time of the purported arrest, see Maryland v. Pringle, 540 U.S. 366, 371 (2003)(Justification for an arrest is determined by the "reasonable conclusion to be drawn from the facts known to the arresting officer at the time of arrest."), the Court will recite only those facts material to this determination.

On January 15, 2003 at about 10:00 P.M., Linda Cardamone, a Licensed Practical Nurse who was employed by Plaintiff to aid him in his daily activities due to the fact that he suffered from Parkinson's Disease, called the 911 emergency number after having a telephone conversation with Plaintiff. Defs. Local Rule 7.1 Stat. of Material Facts Not in Dispute ("Defs. L.R. Stat.") ¶¶ 9, 11.[2] Cardamone informed the 911 operator that she was a nurse, that Plaintiff was her patient, and that Plaintiff had told her during a telephone call that he planned to commit suicide. Id. ¶ 20. Cardamone

---

[2] Citations to Defs. L.R. Stat. are made where Plaintiff has either admitted the assertion in Defendants' Statement, or provided an insufficient factual basis to oppose it.

also told the 911 operator that she was not sure whether Plaintiff actually intended to commit suicide or if he was just "being manipulative." Pl. Local Rule 7.1 Counter-Stat. of Material Facts Not in Dispute ("Pl. L. R. Stat.") ¶ 54.  When asked by the 911 operator whether Plaintiff had the means to commit suicide, Cardamone replied affirmatively, indicating that there were many pills in his residence that he could ingest in a fatal dose. Defs. L.R. Stat. ¶ 21.

New York State Troopers Meehan and Provost (collectively, "the Troopers") were dispatched to Plaintiff's residence in response to this 911 call.  Provost Dep. p. 6.  The Troopers were informed by the dispatcher that Plaintiff's home-care nurse, Ms. Cardamone, had stated that Plaintiff, a 52 year old male that suffered from Parkinson's Disease, had threatened suicide. Id. ¶¶ 23-24; see Pl. L. R. Stat. ¶ 55.  Trooper Meehan was told that a possible method of suicide would be an overdose of pills. Pl. L. R. Stat. ¶ 58.

Upon arrival, Troopers Meehan and Provost repeatedly knocked on Plaintiff's door and announced "State Police," but Plaintiff was unable to immediately respond due to his medical condition. Defs. L.R. Stat. ¶¶ 25-27; Bayne Dep. pp 49-52 (testifying that he heard the knocking but was temporarily "frozen" due to the manifestations of his Parkinson's Disease). When Plaintiff opened the door after a few minutes, the Troopers explained that they had received the 911 call contending that Plaintiff was "currently suicidal." Defs. L.R. Stat. ¶¶ 27-28.  Plaintiff proceeded back into his apartment and sat in a chair, and the Troopers followed him into his apartment. Id. ¶ 29. Plaintiff contends that he was "intimidated back into his apartment by the Troopers who moved forward as [he] backed up." Plf. L.R. Stat. ¶ 29.[3]

---

[3] Plaintiff further contends that while entering the apartment, the Troopers told him that they were going to take him to a psychiatric hospital for an evaluation. Bayne Dep. p. 60.  However, as discussed in the text, *infra*, Plaintiff has

(continued...)

Inside the apartment, the Troopers observed multiple bottles of pills about the residence. Defs. L.R. Stat. ¶ 30.  The Troopers did not know what the pills were for or whether taking any of the pills could be fatal. Plf. L.R. Stat. ¶ 30. Plaintiff was observed as being properly and neatly groomed, and presented as coherent, articulate and intelligent. Id. ¶ 55. The Troopers informed Plaintiff that the 911 call had been placed by Cardamone. Defs. L.R. Stat. ¶ 31.  Defendants assert that Plaintiff admitted to them that he had made a statement to Cardamone to the effect that he was going to commit suicide, but asserted to the Troopers that he was not serious when he made the statement. See Defs. L.R. Stat. ¶ 32.  Plaintiff denies making such statements either to Cardamone or to the Troopers. See Plf. L.R. Stat. ¶ 32.

Once seated in his apartment, Plaintiff picked up the telephone and called his sister.  He told his sister that the Troopers were in his apartment and intending to take him to a hospital for an evaluation. Bayne Dep. pp. 58-60.  One of the Troopers spoke with Plaintiff's sister and then gave the phone back to Plaintiff at which time Plaintiff's sister told Plaintiff that "they're going to take you." Id. p. 59.  Plaintiff then told the Troopers that he would not go, at which time Trooper Meehan purportedly placed his hand on his handcuffs, id. p. 61, and two Paramedics ("the Paramedics") were brought into the apartment with a gurney. Bayne Dep. p. 61.[4]  Plaintiff was then told by one of the Troopers: "We can do this the easy way or the hard way." Id.

The paramedics observed Plaintiff swearing at the Troopers and becoming increasingly

---

[3](...continued)
also admitted that the Troopers made the decision to take him into custody only after events unfolded, including a telephone conversation between Trooper Provost and Cardamone.

[4] Two paramedics from the Clifton Park Ambulance, Peter Lennon and Michael Siis, were also dispatched to Plaintiff's apartment following the 911 call. Defs. L.R. Stat. ¶ 40.

agitated. Defs. L.R. Stat. ¶¶ 41-46. Plaintiff denied to the Paramedics that he threatened suicide but stated that he might have been "talking in his sleep." Id. ¶ 45.[5] One of the Paramedics opined that Plaintiff was acting "irrationally," but at deposition he stated that he formed this opinion because he does not "think it is normal for people to threaten to take their life." Siis Dep. p. 12; see Defs. L.R. Stat. ¶¶ 43-44.

Plaintiff contacted Cardamone by telephone and Trooper Provost spoke with her and asked whether Plaintiff said he planned to commit suicide. Defs. L.R. Stat. ¶¶ 33-35. Cardamone responded: "Yes, he did." Cardamone Dep. p. 65. Plaintiff then got on the telephone with Cardamone and said, in substance: "What the f--k is this. I said I have got two troopers here saying that in your medical opinion I'm suicidal." Defs. L.R. Stat. ¶ 36. Cardamone responded by verifying to Plaintiff that she had informed the police that Plaintiff had threatened suicide. Id. ¶ 37. When Plaintiff asked Cardamone to tell the Troopers that he was not suicidal, Cardamone refused and attempted to comfort Plaintiff by saying: "Everything's going to be all right." Id. ¶ 38.

After Trooper Provost spoke with Cardamone, the Troopers determined that Plaintiff should be evaluated by a mental health professional even if it meant taking Plaintiff into custody pursuant to New York State Mental Hygiene Law § 9.41. Id. ¶ 39.[6] The Troopers and the Paramedics then

---

[5] It is unclear from the record whether Plaintiff was offering this as an explanation as to why Cardamone would call 911 and make such a report if he did not make the statement, or as an explanation for making the statement without meaning it.

[6] Plaintiff admits through the Local Rule Statements that Trooper Meehan formed the intent to take him into custody after Trooper Provost spoke to Cardamone, but contends that Trooper Provost formed the intent to arrest Plaintiff as soon as she received the 911call. Plaintiff bases this argument on the fact that Trooper Provost testified that, based upon her understanding of MHL § 9.41, she has the authority to take a person into custody for a mental health evaluation whenever she receives a 911call asserting that the person has threatened suicide. See Provost Dep. pp. 19-21. However, Trooper Provost testified that, in this particular case, she determined to take Plaintiff into custody after she spoke to Cardamine. Id. p. 14. Further, there is no dispute that Provost did not attempt to take Plaintiff into custody before she corroborated the substance of the 911 call by speaking to Cardamone. Thus, there is insufficient factual basis

(continued...)

spent approximately 40 minutes attempting to convince Plaintiff that he needed to be evaluated by a mental health professional because they were concerned for his well-being based upon his threat of suicide as reported by Cardamone. Defs. L.R. State ¶ 48. "After 40-45 minutes, upon the repeated urgings of the Troopers and the Paramedics, Plaintiff voluntarily got on the gurney with the assistance of the EMTs and Trooper Meehan." Id. ¶ 50. Plaintiff was transferred into the care of the Paramedics, and the Troopers had no contact with Plaintiff subsequent to his being placed in their care. Id. ¶ 51. Plaintiff was transported to Saratoga Hospital where he was released the next morning. Id. ¶ 52. This action and the instant motion followed.

### III. STANDARD FOR SUMMARY JUDGMENT

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, See Tenenbaum v. Williams, 193 F.3d 581, 592 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes

---

[6](...continued)
to deny that Provost formed the intend take Plaintiff into custody only after speaking with Cardamone. To the extent that Provost might have misunderstood her authority to make an "arrest" under MHL § 9.41, that misunderstanding did not cause the arrest until *after* she investigated the situation and spoke to Cardamone and, therefore, is not material to the issue now before the Court. See Maryland v. Pringle, 540 U.S. at 371 (Justification for an arrest is determined by the "reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of arrest*.")(emphasis added); Kerman v. City of New York, 261 F.3d 229, 235 (2d Cir. 2001)("For Fourth Amendment purposes, the reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time.") (citing *Graham v. Connor,* 490 U.S. 386, 397 (1989)).

demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998).

**IV. DISCUSSION**

    **A.    Eleventh Amendment**

Defendants argue that the claims against the New York State Police and the individual defendants in their official capacities are barred by the Eleventh Amendment. Plaintiff has not opposed this portion of the motion. The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim, see Rizzo-Puccio v. College Auxiliary Services, Inc., 216 F.3d 1073 (2d Cir. 200)(claims not addressed in opposition to defendant's motion for summary judgment were deemed abandoned), and, in the Northern District of New York, is deemed consent to granting that portion of the motion. See N.D.N.Y.L.R. 7.1(b)(3); Bundy Am. Corp. v. k-z Rental Leasing, Inc., 2001 WL 237218, at *1 (N.D.N.Y. Mar. 9, 2001)(Hurd, J.); Beers v. General Motors Corp., 1999 WL 325378, at *8 (N.D.N.Y. May 17, 1999)(McCurn, S.J.). Upon Plaintiff's failure to addressed or reply to that portion of Defendants' motion seeking summary judgment on the claims against the New York State Police and/or the individual defendants in their official

capacities on Eleventh Amendment immunity grounds, these claims are deemed impliedly abandoned and are summarily dismissed.

Furthermore, summary judgment is appropriate on these claims. The Eleventh Amendment prohibits courts from exercising jurisdiction over lawsuits seeking monetary damages against a state, an agency thereof, or a state official sued in his or her official capacity unless the state waives sovereign immunity or Congress has expressly and validly abrogated that immunity. Board of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 363 (2001); Board of Educ., Pawling Cent. Sch. v. Schutz, 290 F.3d 476, 480 (2d Cir. 2002), cert. denied, 123 S. Ct. 1284 (2003); Aiken v. Nixon 236 F. Supp. 2d 211, 226-227 (N.D.N.Y. 2004), aff'd, 80 Fed. Appx. 146 (2d Cir. 2003)(unpublished decision); see A.A. v. Board of Edu., 196 F. Supp. 2d 269, 264 (E.D.N.Y. 2002)("Lawsuits against state officials in their official capacities are not lawsuits against these individuals but, rather, are lawsuits against the official's office.")(citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)). "It has long been held that Section 1983 does not allow a State to be called into Federal Court to answer in damages for the alleged deprivation of a federal right." A.A. v. Board of Edu., 196 F. Supp.2d at 266 (citation omitted).

Inasmuch as New York has not waived its immunity from a Section 1983 damages award, that much of the case brought against the New York State Police and the individual defendants in their official capacities is barred by the Eleventh Amendment. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100-01 (1984); Schutz, 290 F.3d at 480; United States v. City of Yonkers, 96 F.3d 600, 619 (2d Cir. 1996)(affirming dismissal of Section 1983 suit brought against State Education Department on Eleventh Amendment grounds); Aiken, 236 F. Supp. 2d at 226-227. Further, "[j]ust as the Eleventh Amendment bars claims for relief under federal law, it acts

as a bar to state law claims brought against a state in federal court." A.A. v. Board of Edu., 2002 WL 654319, at *6 (citing Winokur v. Office of Court Administration, 2002 WL 397657, at *6 (E.D.N.Y. March 14, 2002)). Accordingly, all claims against the New York State Police and the individual defendants in their official capacities are dismissed.

### B. FALSE ARREST UNDER MHL § 9.41

Next, the Court turns to Plaintiff's claims concerning his alleged false arrest and false imprisonment on January 15, 2003.

#### 1. Elements of a False Arrest Claim

The elements of a cause of action for false arrest brought under the Fourth Amendment and state common law are the same. These are: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996); Broughton v. State of New York, 37 N.Y.2d 451, 456 (1975). Because false arrest is a type of false imprisonment, the two claims have identical elements. See Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995), cert. denied, 517 U.S. 1189 (1996).

#### 2. Privilege for the Confinement.

The instant dispute concerns only the fourth element - that is, whether Plaintiff's confinement was privileged. Plaintiff contends that he was unlawfully confined when the Troopers "took him from his home and placed him in the custody of an ambulance crew [] which brought him to Saratoga Hospital for a mental health evaluation" without legal justification. Compl. ¶ 13; see also id. ¶ 26 ("Plaintiff Bayne was taken into custody by the defendant Troopers and was placed by them in the custody of the emergency medical ambulance team and was then kept in custody at the

Saratoga Hospital.").[7] He argues that there was no legal justification for this confinement. See Pl. Mem. L. p. 1 (framing the question in this case as whether the Troopers were justified by MHL § 9.41 to remove Plaintiff from his home despite his objection.). Defendants contend that any confinement of the Plaintiff was privileged by MHL § 9.41.

> New York MHL § 9.41 provides in relevant part:
>
> Any peace officer, when acting pursuant to his or her special duties ... may take into custody any person who appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40.

MHL § 9.41. The phrase "likely to result in serious harm" is defined as "a substantial risk of physical harm to the person as manifested by threats or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself." MHL § 9.01.

If Plaintiff's confinement was legally justified under the authority of MHL § 9.41, then his confinement was privileged and his federal and state law claims fail as a matter of law. See Kerman v. City of New York, 261 F.3d 229, 240 n.8 (2d Cir. 2001) ("We interpret [§9.41] ... consistently with the requirements of the Fourth Amendment and therefore assume that the same objective

---

[7] Neither party addresses the specific question of when the purported unlawful confinement occurred. See Medeiros v. O'Connell, 150 F.3d 164, 167 (2d Cir. 1998)("The first step [in any section 1983 claim predicated on the Fourth Amendment] is to determine whether there has been a constitutionally cognizable seizure."). This is interesting inasmuch as Plaintiff admits that he "voluntarily got on the gurney" after the Troopers and the Paramedics spent 40 minutes convincing him of the need to go the hospital for a mental health evaluation. It would seem, by logical extension, that by getting on the gurney Plaintiff voluntarily agreed to be transported to the hospital for an evaluation. Nonetheless, given the parties' lack of any argument on this point, and because Plaintiff asserts that he did not voluntarily allow the Troopers into his apartment in the first place, the Court will presume for purposes of this motion that Plaintiff's admission that he voluntarily got on the gurney does mean that he voluntarily agreed to be transported to the hospital and held overnight for evaluation, or that he would have agreed to get on the gurney if he felt he had any other options. See Terry v. Ohio, 392 U.S. 1 (1968)(Whenever an individual is physically or constructively detained by a police officer in such a manner that a reasonable person would not feel he is free to leave, that individual has been "seized" or "arrested" within the meaning of the Fourth Amendment.); Tennessee v. Garner, 471 U.S. 1 (1985)("Whenever an officer restrains the freedom of a person to walk away, he has seized the person.").

reasonableness standard is applied ... Therefore, our constitutional analysis controls this state law issue as well); Higgins v. City of Oneonta, 617 N.Y.S.2d 566, 569 (3d Dep't 1994) ("Given [the police officers'] knowledge of plaintiff's longstanding hostility toward certain members of the Police Department and City officials, coupled with [his treating psychiatrist's] opinion that plaintiff was dangerous and the obvious threatening nature of plaintiff's phone calls, there is sufficient evidence to find as a matter of law that defendants are entitled to the privilege afforded them by Mental Hygiene Law former § 9.41.").

### 3. Probable Cause

The Courts that have addressed seizures under a state's mental hygiene or mental health laws have applied the concepts of "probable cause" that have arisen in criminal Fourth Amendment seizure cases. See Kerman v. City of New York, 261 F.3d 229, 235 (2d Cir. 2001); Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997); Gooden v. Howard County, 954 F.2d 960, 964 (4th Cir. 1992); Vallen v. Connelly, 2004 WL 555698, at * 7 (S.D.N.Y. March 19, 2004);[8] Sanchez v. Town of Greece, 2004 WL 1964505, at * 4 (W.D.N.Y. Sept. 1, 2004). Because the existence of probable cause to arrest an individual is a complete defense to both federal and state law claims for

---

[8] In Vallen, the South District wrote:

> It is well-established that "involuntary civil commitment is a 'massive curtailment of liberty' and it therefore cannot permissibly be accomplished without due process of law." Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995)(quoting Vitek v. Jones, 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)). Accordingly, the Fourth Amendment requires an official to have probable cause to believe that a person is dangerous to himself or others before he can seize and detain such person for a psychiatric evaluation. See Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993)("The Crisis Team took [plaintiff] to the hospital against his will, and he was involuntarily confined there pursuant to state law. This infringement of his liberty was tantamount to the infringement of being arrested. That his seizure occurred in the civil context does not render the Fourth Amendment inapplicable.")(citations omitted).

2004 WL 555698, at * 7.

11

false arrest and false imprisonment, see Weyant, 101 F.3d at 852, the critical question in this case is whether the Troopers possessed probable cause to conclude that Plaintiff was acting in a manner that would justify a MHL § 9.41 seizure. See Sanchez, 2004 WL 1964505, at * 4 ("Here, the defendant officers had sufficient probable cause to believe that Sanchez might be mentally ill and that he should be arrested pursuant to New York's Mental Hygiene Law [§ 9.41].").

In the criminal context, probable cause exists when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Posr v. Court Officer Shield No. 207, 180 F.3d 409, 414 (2d Cir. 1999). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, -- U.S. --, --, 125 S. Ct. 588, 593 (2004)(citing Maryland v. Pringle, 540 U.S. 366, 371 (2003); see Kerman, 261 F.3d at 235 ("For Fourth Amendment purposes, the reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time.")(citing Graham v. Connor, 490 U.S. 386, 397 (1989)). The probable cause inquiry is an objective one and the subjective beliefs or motivations of the arresting officer are irrelevant. Devenpeck, 125 S.Ct. at 593-94; Whren v. United States, 517 U.S. 806, 813 (1996); Martinez v. Simonetti, 202 F.3d 625, 633 (2d Cir. 2000). "A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." Hahn v. County of Otsego, 820 F. Supp. 54, 55 (N.D.N.Y. 1993), aff'd, 52 F.3d 310 (2d Cir. 1995). "[T]he eventual disposition of the criminal charges is irrelevant to the probable cause determination." Hahn, 820 F. Supp. at 55 (citing Pierson v. Ray, 386 U.S. 547, 555 (1967)). Police

12

officers may rely upon information gained from other officers in making their probable cause assessment, see Savino v. City of N.Y., 331 F.3d 63, 74 (2d Cir. 2003)("The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, "'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.'")(quoting Illinois v. Andreas, 463 U.S. 765, 772 n. 5 (1983)), and on information gained from witnesses or private citizens. Lee v. Sandberg, 136 F.3d 94, 103 (2d Cir. 1997). The fact that a complaining witness has identified herself, as opposed to remaining anonymous, is an important factor in assessing the weight officers may reasonably put on information received from private citizens. See Kerman, 261 F.3d at 236 (holding that an "uncorroborated and anonymous 911 call" stating only that "a mentally ill man at [an identified] location was off his medication and acting crazy and possibly had a gun" was not supported by sufficient indicia of reliability to justify the police officers' warrantless entry into the plaintiff's home); Sha v. N.Y.C. Police Dept., 2005 WL 877852, at * 5 (S.D.N.Y. Rep.-Rec. April 18, 2005).[9]

---

[9] In Sha, New York City police officers received a 911 call from a woman named Marlene Glasser reporting that plaintiff Ayva Sha, a woman with a brain injury and a history of seizures, had dropped the telephone while talking to her. Sha's telephone line was thereafter repeatedly busy. When the police arrived at Sha's apartment, they knocked for 20 minutes without response, and then removed the locks and entered the apartment to check on Sha. When they discovered that she was fine, they left and Sha later filed an action asserting a Fourth Amendment violation for illegal home entry. In addressing the question of whether the officers were justified in entering the apartment under the circumstances, U.S. Mag. Judge Gorenstein wrote:

> This case can be readily distinguished from Kerman. Here, Glasser was identified by name, address, and phone number.
>
> * * *
>
> The fact that Glasser was not an anonymous caller is a crucial point. In Florida v. J.L., a case the Second Circuit relied on in its holding in Kerman, the Supreme Court distinguished a tip from a "known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" from an anonymous tip which "'seldom demonstrates the informant's basis of knowledge or veracity.'" 529 U.S. 266, 270 (2000)(quoting Alabama v. White, 496 U.S. 325, 329 (1990)). The instant case presents precisely the type of situation in which an informant's tip can be

(continued...)

13

"If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable ... merely because it later turns out that the complaint was unfounded." Lee, 136 F.3d at 103; see Calderola v. Calabrese, 298 F.3d 156, 165 (2d Cir. 2002)("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that might not be the case."); Hotaling v. LaPlante, 67 F. Supp. 2d 517, 522 (N.D.N.Y. 2001)(valid probable cause to arrest rested upon information supplied by an identified witness, and even though a further investigation by the Trooper would have led to a contradictory conclusion, Trooper's conduct was not unreasonable under the circumstances). Further, once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." Ricciuti v. New York City Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997).

By analogy, the question here is whether the facts and circumstances known to the Troopers at the time they determined to take Plaintiff into custody were sufficient to warrant a person of reasonable caution in the belief that Plaintiff might be "mentally ill and [] conducting himself in a manner [] likely to result in serious harm to" himself as those terms are defined by the MHL. See Monday, 118 F.3d at 1102;[10] Vallen, 2004 WL 555698, at * 9 ("Where there is a totality of

---

[9](...continued)
trusted inasmuch as Glasser put her credibility at stake and could be held responsible for her call.

2005 WL 877852, at * 5.

[10] As the Sixth Circuit held in Monday,

a showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior. See Illinois v.

(continued...)

14

circumstances pointing to a 'probability or substantial chance of dangerous behavior, not [even] an actual showing of such behavior,' courts have not hesitated in upholding emergency pick-up orders.")(citing Hoffman v. County of Delaware, 41 F. Supp.2d 195, 209 (N.D.N.Y. 1999), aff'd, 205 F.3d 1323 (2d Cir. 2000)).  Like in the criminal context, a police officer is justified in relying upon a citizen's warning that another person has threatened suicide even if it is later determined by mental health professionals that the person presents no such risk. See Gooden, 954 F.2d at 964 (whether a person seized pursuant to mental health/hygiene law is later found to be mentally competent and released is irrelevant to the probable cause analysis); Sanchez, 2004 WL 1964505, at * 4 ("A mental hygiene arrest can be based on probable cause even though it is later determined that the arrested person does not suffer from a dangerous mental condition.")(citing Vallen, 2004 WL 555698, at *8).  By logical extension of the criminal law false arrest jurisprudence, when an officer receives a credible threat that an individual have threatened suicide, the officer need not explore every "theoretically plausible" defense to an arrest before taking the person into custody. See Ricciuti, 124 F.3d at 128.

Where the facts surrounding the arrest are uncontroverted, the determination as to whether probable cause existed may be made by the court as a matter of law. Weyant, 101 F.3d at 852. Even where factual disputes exist, a § 1983 claim may fail if the plaintiff's version of events is sufficient

---

[10](...continued)
Gates, 462 U.S. 213, 245 n. 13  (1983).  Just as actual innocence will not render an arrest invalid if it is based on then-existing probable cause that criminal activity is occurring, see Criss v. City of Kent, 867 F.2d 259, 262 (6th Cir. 1988), a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition. Because "probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts," Gates, 462 U.S. at 232, courts evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official. See Criss, 867 F.2d at 262-63.

Monday, 118 F.3d at 1102 (parallel citations omitted).

15

to establish probable cause to arrest. Mistretta v. Prokesch, 5 F. Supp.2d 128, 133 (E.D.N.Y. 1998). However, where there are "genuine issues" as to any material facts surrounding the issue of probable cause such that it can be said that the question of probable cause is "predominately factual in nature," the determination should be made by a jury. Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997), cert. denied, 522 U.S. 1115 (1998).

### 4. Probable Cause Analysis

The facts and circumstances known to the Troopers at the time they made the decision to confine Plaintiff were sufficient to warrant a person of reasonable caution in the belief that a seizure was legally justified under MHL § 9.41. While the statute ostensibly requires two separate factual conclusions: (1) that the person appears to be mentally ill, and (2) that the person is conducting himself in a manner which is likely to result in serious harm to himself or others, see MHL § 9.41, the two inquires essentially become one in situations such as the one at hand. If facts and circumstances exist that would warrant a person of reasonable caution to believe that the suspected person had threatened suicide (a statutorily defined "serious injury" sufficient to satisfy the second element), then there would also exist a basis for the suspicion that the person labored under some form of mental illness. This is because the threat of suicide invokes justified concerns for the threatener's metal and emotional well being, as one of the Paramedics concluded. Whether the mere threat of suicide amounts to a manifestation of some form of mental illness from the psychological or psychiatric standpoint is not the point. As the Second Circuit has held, "[p]olice officers are often forced to make on the spot judgments about a person's mental health and should be entitled to reasonable leeway in those situations." Kerman, 261 F.2d at 241.

Here, the facts required the Troopers to make just such an "on the spot" judgment call. The

choice was either: (a) accept Plaintiff's denial of suicidal ideation, leave him alone in his apartment, and risk that he would carry out his purported threat by ingesting the prescription medications that Cardamone already said could be fatal; or (b) persist in an attempt to "convince" Plaintiff to voluntarily get on the gurney in order to transport him to a hospital for a mental health evaluation by an expert in the field and, if necessary, take him into custody against his will. Given (1) the corroborated warning by Plaintiff's nurse that Plaintiff had threatened suicide earlier; (2) the fact that the 911 call had been placed by a nurse who had on-going personal interactions with Plaintiff; (3) the potential means to commit suicide through the ingestion of numerous prescription medication; (4) the evident physical impairment suffered by Plaintiff that might very well have invoked periods of despair in even the most mentally hearty individual; and (5) Plaintiff's clearly agitated metal state brought about by the inquiry from the 911 call, a reasonable fact finder could only conclude that the Troopers' decision was justified because there existed sufficient probable cause to believe that Plaintiff presented a risk of suicide.

     Indeed, even accepting that Plaintiff denied making the threat and having suicidal desires, the Troopers were nevertheless presented by an ostensibly genuine concern for Plaintiff's safety by a person who interacted daily with Plaintiff, who had some medical training, and who persisted in her position that Plaintiff had made the threat of suicide. Based upon these facts, there was a reasonable basis to conclude that Plaintiff's denial of suicidal ideation was questionable. The Troopers were not required to obtain a qualified mental health opinion before seizing Plaintiff under MHL § 9.41. See Ricciuti, 124 F.3d at 128. As stated above, the fact that Plaintiff was subsequently found to mentally competent and released from Saratoga Hospital is irrelevant to the Court's determination whether probable cause existed.

Giving the Troopers the reasonable leeway they are entitled to in making assessments of other people's mental states, a reasonable fact finder could only conclude that the facts known to the Troopers were sufficient to warrant a person of reasonable caution to suspect that Plaintiff's mental state was such that he might attempt suicide. In light of numerous bottles of prescription medication in Plaintiff's apartment that might have been fatal if ingested, there also reasonably appeared to be the means to commit the threatened act.  Thus, the Troopers were legally justified in seizing Plaintiff under MHL § 9.41 and, accordingly, the claims against the Troopers must be dismissed.

### 5. Qualified Immunity

Defendants further contend that, even if their actions violated Plaintiff's Fourth Amendment rights because actual probable cause did not exist, they are entitled to qualified immunity. The Court agrees.

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action ... assessed in light of the legal rules that were clearly established at the time it was taken."
Anderson v. Creighton, 483 U.S. 635, 639 (1987)(internal quotation marks and citation omitted)

> Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act.

Anthony v. City of New York, 339 F.3d 129 (2d Cir. 2003)(internal quotation marks and citations omitted).  "[Q]ualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances," and officers are entitled to the defense unless the officers' judgment was so flawed that no reasonable officer would have made a

similar choice. See Lennon v. Miller, 66 F.3d 416, 424-25 (2d Cir. 1995).

Assuming *arguendo* that actual probable cause did not exist to take Plaintiff into custody under MHL § 9.41, the officers are entitled to qualified immunity because arguable probable cause existed. See Escalera v. Lunn, 361 F. 3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Id. (quoting Golino v. City of New Haven, 950 F. 2d 864, 870 (2d Cir. 1991)). Given all the facts presented here, officers of reasonable competence could disagree whether they were justified in seizing Plaintiff pursuant to MHL § 9.41 to ensure his safety through a metal health evaluation. See Sanchez, 2004 WL 1964505, at * 4; Vallen, 2004 WL 555698, at * 10. Accordingly, the individual defendants are entitled to qualified immunity and this defense serves as an alternative basis to dismiss the federal claims against them.

## V. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [dkt. # 23] is **GRANTED** and the action is **DISMISSED**.

**IT IS SO ORDERED**

DATED:   August 4, 2005

Thomas J. McAvoy
Senior, U.S. District Judge